UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| TYREE NUNN, ) | |
| ) | No. EDCV 10-383 AJW |
| ) | |
| Plaintiff, ) | |
| v. ) | MEMORANDUM OF DECISION |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff filed this action seeking reversal of the decision of the defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying in part plaintiff's application for Supplemental Security Income ("SSI") benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

Plaintiff applied for SSI benefits on April 20, 2004, alleging that he became disabled as of March 20, 2004. [JS 2]. On June 17, 2008, the ALJ issued a partially favorable final written hearing decision concluding that plaintiff was disabled from March 10, 2004 through February 28, 2006 due to residual effects of bilateral broken ankles sustained when plaintiff fell from a second story balcony. [AR 15, 18]. The ALJ concluded that plaintiff was not disabled after February 28, 2006 because medical improvement had occurred related to plaintiff's ability to work, giving plaintiff the residual functional capacity ("RFC") for sedentary work with use of a cane for

ambulation, occasional operation of foot controls with the left lower extremity, and no exposure to heights. [AR 18]. The ALJ concluded that plaintiff was not disabled after February 28, 2006 because his RFC as of that date did not preclude him from performing a significant number of jobs available in the national economy. [AR 21].

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

**Discussion**

**Medical improvement**

Plaintiff contends that the ALJ erred in finding that medical improvement occurred, and plaintiff's disability ended, on February 28, 2006. Specifically, plaintiff argues that the ALJ improperly rejected a consultative examining physician's September 2007 opinion that plaintiff needed to use a wheelchair. Plaintiff contends that the examining physician's opinion demonstrates that plaintiff was disabled at least through the date of that opinion under section 1.02 of the Listing

of Impairments (the "Listing") due to ankle ankylosis[1] and the inability to ambulate without the use of both hands (that is, without using a wheelchair, walker, two canes, or two crutches). See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.00B2b, 1.02.

Once a claimant is found disabled under the Social Security Act, a presumption of continuing disability arises. See Bellamy v. Sec'y of Health & Human Servs., 755 F.2d 1380, 1381 (9th Cir. 1985); Mendoza v. Apfel, 88 F.Supp.2d 1108, 1113 (C.D. Cal. 2000). Benefits cannot be terminated unless substantial evidence demonstrates medical improvement in the claimant's impairment such that the claimant is able to engage in substantial gainful activity. See 42 U.S.C. § 423(f); Murray v. Heckler, 722 F.2d 499, 500 (9th Cir. 1983). Although the claimant retains the burden of proof, the presumption of continuing disability shifts the burden of production to the Commissioner to produce evidence to meet or rebut the presumption. See Bellamy, 755 F.2d at 1381.

"Medical improvement" is defined as

> any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (see § 404.1528).

20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i).

During the April 2007 administrative hearing, the ALJ elicited testimony from a medical expert, Dr. Doren, who testified that plaintiff suffered a dislocation of the ankle joint requiring the placement of screws and a fracture of the proximal fibula in the right lower extremity, and "a pilon fracture, which is a very severe fracture that extends from the distal tibia into the ankle" in the left lower extremity. [AR 231]. Plaintiff's left fracture had been treated with an external fixator, but

---

[1] Ankylosis means "[m]arked stiffness of a joint typically observed with end-stage arthritis, following a complex intra-articular fracture, delayed treatment of septic arthritis, or severe rheumatoid arthritis." American Academy of Orthopaedic Surgeons, Your Orthopedic Connection, "Glossary of Orthopaedic Words," at http://orthoinfo.aaos.org/glossary.cfm (last visited April 5, 2011).

1 he had not undergone surgery. [AR 228-230]. Dr. Doren explained that "in general, [pilon
2 fractures] are very, very bad fractures when they are not operated upon and have been treated with
3 the external fixator." [AR 231]. He added that one would "almost expect" that a fusion procedure
4 would be required to "get rid of the pain and solidify the joints so the person could function." [AR
5 231]. Dr. Doren opined that plaintiff's medical records, the most recent of which dated from
6 November 2004, were insufficient to allow him to formulate an opinion about plaintiff's condition.
7 He recommended that updated medical records, if any, be obtained, and that plaintiff undergo a
8 consultative orthopedic examination. [See AR 225, 228-232].

9 Plaintiff testified he had received medical treatment for his ankle fractures through an
10 "MIA" (medically indigent adult) program, and that his doctors had "tr[ied] to set [him] up for the
11 ankle fusion" on the left side in 2005, but that he did not undergo the procedure because

12 > I lost the place where I was staying, and I didn't really have anyplace to live at that
13 > point as far as to lay up. If I had that bone ankle fusion then he told me that it was
14 > going to take several weeks after that if I were to have that operation [sic], and I
15 > just didn't have anywhere to go.

16 [AR 227].

17 At the time of the hearing, plaintiff testified said that he was staying with someone, but still
18 did not have a stable place to live. [AR 229-230]. He said that he was taking Norco, a narcotic
19 painkiller (Norco) prescribed by doctors at Arrowhead Regional Medical Center, and that he used
20 a cane for support and balance. Plaintiff testified that he had been prescribed a wheelchair and
21 also had been given a walker, but "as I slowly healed a little bit I was able to get around more
22 mobile with the cane than the walker." [AR 236-237]. Plaintiff said that he could probably walk
23 10 or 15 minutes with the cane. [AR 237]. He also said that he experienced frequent lower back
24 pain and swelling in the ankles, and that his doctor told him to elevate his feet when possible. [AR
25 237-238]. Plaintiff said that he could sit for less than half an hour before swelling occurred. [AR
26 238].

27 Plaintiff's attorney noted that he had submitted to the ALJ additional records from early
28 2005, but the hearing transcript indicates that Dr. Doren had not seen them. [AR 225, 232-234,

1   243]. Those medical records indicate that in January 2005, plaintiff sought treatment for left ankle
2   pain from Arrowhead Regional Medical Center. X-rays of the left ankle showed that the tibial
3   fracture was relatively unchanged with a possible "partial nonunion," and progressive healing of
4   the fibular fracture. [AR190]. A CAT scan showed "severe disuse osteopenia[2]" in the left ankle
5   and foot. The CAT scan also showed further healing of the tibia and fibular fractures, but with a
6   "still significant fracture gap of the distal tibial shaft fracture." [AR 191]. Follow-up notes dated
7   February 9, 2005 state that the plan was for plaintiff to undergo a left tibia bone graft. [AR 192-
8   196].

9   X-rays of plaintiff's ankles taken on April 27, 2007 showed deformity of the posterior
10  malleolus (the back of the "shin bone" at ankle level[3]) suggesting an old fracture, with no acute
11  fracture or tissue swelling in the right ankle, and an old fracture of the left distal tibia and fibula
12  with degenerative disc disease. [AR 18, 208-209, 214].

13  The ALJ ordered a consultative orthopedic examination for plaintiff with Jeff Altman,
14  M.D., a board-certified specialist in physical medicine and rehabilitation. [See AR 204-207, 243].
15  Dr. Altman examined plaintiff on September 16, 2007. [AR 204-207]. He noted that plaintiff
16  presented in a wheelchair, and that plaintiff said that he was not weight-bearing because his left
17  foot fracture had not healed properly. [AR 204]. Due to his presentation in a wheelchair, plaintiff
18  was "not able to perform station and gait testing." [AR 205]. Dr. Altman's examination of
19  plaintiff's ankles revealed

> some atrophy in the left calf musculature when compared to the right. There was,
> overall, minimal motion at the left ankle and some tenderness with [a] small
> surgical scar over the ankle. There was some general tenderness over the bilateral
> malleoli [the round protuberances on each side of the ankle] as well as in the

---

[2]   Osteopenia means: (1) "[d]ecreased calcification or density of bone; a descriptive term applicable to all skeletal systems in which such a condition is noted; carries no implication about causality," or (2) "[r]educed bone mass due to inadequate osteoid synthesis." Stedman's Medical Dictionary osteopenia (27th ed. 2000).

[3] See American Academy of Orthopaedic Surgeons, Your Orthopedic Connection, "Ankle Fractures," at http://orthoinfo.aaos.org/topic.cfm?topic=A00391(last visited April 5, 2011).

|   |   |
|---|---|
| 1 | calcaneus.  On the right foot, there was a small surgical scar which is well-healed |
| 2 | over the lateral ankle. [Plaintiff] had approximately 5 degrees of dorsiflexion |
| 3 | [upward flexion] and 30 degrees of plantar flexion [downward flexion]. |

4 [AR 206]. Plaintiff had pain on palpation over the dorsal aspect of the foot. [AR 206].

5 In an assessment form accompanying his examination report, Dr. Altman said that plaintiff
6 could not perform standing or walking because he "needs [wheelchair] based on exam." [AR 198].
7 Dr. Altman indicated that plaintiff could operate foot controls frequently with his right foot and
8 occasionally with his left foot, could not engage in any postural activities or tolerate exposure to
9 unprotected heights, and could occasionally drive or tolerate exposure to moving mechanical parts.
10 [AR 199-201]. Dr. Altman also indicated that plaintiff could not "ambulate without using a
11 wheelchair, walker, or 2 canes or 2 crutches," "walk a block at a reasonable pace on rough or
12 uneven surfaces," or "climb a few steps at a reasonable pace with the use of a single hand rail."
13 [AR 202]. Dr. Altman indicated that the limitations he indicated had lasted or would last for
14 twelve consecutive months. [AR 202].

15 The ALJ noted that plaintiff's last medical treatment of record for bilateral ankle fractures
16 occurred in February 2005. [AR 20]. Saying he was giving plaintiff "the benefit of the doubt," the
17 ALJ found that plaintiff's disability due to residuals of bilateral ankle fractures ended one year
18 later, on February 28, 2006, and that medical improvement occurred after that date, ending
19 plaintiff's period of disability. [AR 20-21]. The ALJ rejected Dr. Altman's September 2007
20 opinion that plaintiff needed a wheelchair. The ALJ concluded that there was evidence that
21 plaintiff put forth less than maximal effort during Dr. Altman's examinations, and that plaintiff
22 "refused to ambulate without the use of his cane." [AR 20 (citing AR 211)]. The ALJ also said
23 that Dr. Altman

|   |   |
|---|---|
| 24 | seem[ed] to rely solely on [plaintiff's] subjective statements and assumed that he |
| 25 | required a wheelchair.  Subsequent diagnostic imaging showed only mild |
| 26 | degenerative disease and fusion of the left ankle and a normal right ankle. This |
| 27 | documents that [plaintiff's] medical condition indicates less severe limitations. |

28 [AR 20]. The ALJ found that plaintiff could ambulate but required use of a single-point cane. [AR

20].

The ALJ's reasons for rejecting Dr. Altman's September 2007 are not legitimate and are not based on substantial evidence in the record. First, Dr. Altman did not indicate that plaintiff was uncooperative or put forth suboptimal effort during the September 2007 examination. Dr. Altman described plaintiff's reliability as "average." [AR 204]. He did not say that plaintiff refused to perform station and gait testing, but rather than he was "not able" to do so. [AR 205]. Nothing in his reports suggest that Dr. Altman drew a negative inference from plaintiff's stated inability to perform station and gait testing, and the ALJ was not entitled to substitute his own judgment for Dr. Altman's medical judgment as to the necessity or materiality of such testing. Cf. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00J4 ("When an individual with an impairment involving a lower extremity or extremities uses a hand-held assistive device, such as a cane, crutch or walker, *examination should be with and without the use of the assistive device unless contraindicated by the medical judgment of a physician who has treated or examined the individual.*") (emphasis added).

Second, Dr. Altman did not rely solely on plaintiff's subjective statements to assess his functional limitations and need for a wheelchair. Instead, Dr. Altman properly made clinical findings supporting his conclusions: "minimal" range of motion in the left ankle and foot, very limited range of motion in the right ankle and foot, and evidence of atrophy in the calf musculature. Cf. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00J4 ("The medical basis for the use of any assistive device *(e.g., instability, weakness)* should be documented.") (emphasis added). In addition, Dr. Altman expressly concluded that plaintiff needed a wheelchair "based on exam," a statement that contradicts the ALJ's assertion that Dr. Altman merely endorsed plaintiff's subjective complaints. [AR 198].

Third, there is no "subsequent diagnostic testing" that materially contradicts or undermines Dr. Altman's September 2007 disability opinion, as the ALJ suggested. On March 20, 2008, Dr. Altman examined plaintiff a second time and obtained x-rays. [AR 210-213]. Plaintiff had slight atrophy in the left foot with "no appreciable" range of motion in the left ankle. The new x-rays showed mild degenerative disease associated with a previous healed fracture of the distal tibia on

the left, and a normal right ankle. [AR 214]. Dr. Altman's impression was "a history of bilateral ankle fracture with ankle fusion of the left foot with decreased function and antalgic gait as a result." [AR 210-213]. He opined that plaintiff could perform the lifting, carrying, standing, and walking requirements of sedentary work, but that a cane was medically necessary for plaintiff to ambulate distances of more than 50 feet. [AR 215-220].

Plaintiff does not contend that his condition remained static between September 2007 and March 2008, when Dr. Altman–based in part on the new x-rays–concluded that plaintiff's condition had improved. [See AR 210-221]. Thus, the "subsequent diagnostic testing" does not amount to a legitimate or convincing reason for rejecting Dr. Altman's September 2007 disability opinion.

For these reasons, the ALJ erred in rejecting Dr. Altman's September 2007 disability opinion.[4] That opinion shows that plaintiff remained disabled as September 16, 2007. Therefore, the ALJ improperly concluded that plaintiff's disability ended on February 28, 2006.

The record contains no medical evidence regarding plaintiff's condition between Dr. Altman's two consultative examinations in September 2007 and March 2008. Because a presumption of continuing disability applies, and a finding of medical improvement "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with" a claimant's impairments, the Commissioner has not shown that medical improvement occurred any earlier than March 30, 2008, the date of Dr. Altman's second examination. 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). Therefore, plaintiff was disabled at least through that date.

**RFC assessment**

The ALJ relied on Dr. Altman's March 2008 opinion to find that after plaintiff's closed period disability ended on February 28, 2006, plaintiff had the RFC for sedentary work except that he requires a single-point cane for ambulation, can only occasionally operate foot controls with

---

[4] It is undisputed that plaintiff would be disabled with the severe limitations assessed by Dr. Altman in September 2007, including the need for a wheelchair  Accordingly, it unnecessary to consider whether Dr. Altman's opinion establishes that plaintiff met or medically equaled all of the criteria for presumptive disability under sections 1.02 or 1.06 of the Listing.

- 8 -

1 the left lower extremity, and must avoid exposure to heights. [AR 18, 21]. Plaintiff does not
2 contend that the ALJ erred in relying on Dr. Altman's March 2008 opinion; however, he argues
3 that the ALJ omitted from his RFC finding certain limitations imposed by Dr. Altman.

4 To perform the full range of sedentary work, a claimant must be able to lift up to ten
5 pounds at a time and must occasionally lift or carry articles like docket files, ledgers, and small
6 tools. Sedentary jobs involve walking and standing "occasionally," which means up to one-third
7 of the time, typically about two hours during an eight-hour workday. Sitting is required for about
8 six hours during an eight-hour workday. See 20 C.F.R. §§ 404.1567(a), 416.967(a); Social
9 Security Ruling ("SSR") 96-9p, 1996 WL 374185, at *3; SSR 83-10, 1983 WL 31251, at *5.

10 Plaintiff concedes that Dr. Altman found that plaintiff could sit and stand in total for up
11 to two hours a day, as required to perform sedentary work. Plaintiff argues, however, that the ALJ
12 failed to account for Dr. Altman's opinion that plaintiff could not stand or walk for more than one
13 hour *at a time*. Plaintiff also contends that the ALJ did not incorporate Dr. Altman's limitation
14 to only occasional balancing, stooping, kneeling, crouching, and crawling.

15 > The full range of sedentary work requires the ability
16 > to stand and walk for a total of approximately 2 hours during an 8-hour workday.
17 > If an individual can stand and walk for a total of slightly less than 2 hours per
18 > 8-hour workday, this, by itself, would not cause the occupational base to be
19 > significantly eroded. Conversely, a limitation to standing and walking for a total
20 > of only a few minutes during the workday would erode the unskilled sedentary
21 > occupational base significantly.

22 SSR 96-9p, 1996 WL 374185, at *6. Nothing in the definition of sedentary work suggests that
23 an individual must be able to stand or walk for two hours continuously, or that being able to stand
24 and walk for no more than one-hour increments is incompatible with the demands of sedentary
25 work. Furthermore, "[p]ostural limitations or restrictions related to such activities as climbing
26 ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode
27 the occupational base for a full range of unskilled sedentary work significantly because those
28 activities are not usually required in sedentary work." SSR 96-9p, 1996 WL 374185; see also SSR

1    85-15, 1985 WL 56857, at *6- *7. Accordingly, plaintiff's contention that the ALJ's RFC finding
2    is inaccurate or incomplete lacks merit.

3    **Application of the grids**

4    Plaintiff contends that the nonexertional limitations included in the ALJ's RFC made it
5    inappropriate for the ALJ to use the grids to find him not disabled, and that vocational expert
6    testimony was required.

7    When a claimant has solely exertional (strength) limitations, the ALJ must apply the grids,
8    which will direct a finding of disabled or not disabled. See 20 C.F.R. Pt. 404, Subpt. P, App. 2,
9    Rule 200.00(a); Lounsburry v. Barnhart, 468 F.3d 1111, 1115 (9th Cir. 2006); Cooper v. Sullivan,
10   880 F.2d 1152, 1155 (9th Cir.1989). When a claimant suffers solely non-exertional (non-strength)
11   limitations, "the grids do not resolve the disability question" and the ALJ must rely on other
12   evidence, typically the testimony of a vocational expert, to support a finding of nondisability. See
13   20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 200.00(e)(1); Lounsburry, 468 F.3d at 1115; Cooper, 880
14   F.2d at 1155.

15   Where, as here, a claimant suffers from severe exertional limitations and severe
16   nonexertional limitations that restrict the range of work the claimant can perform at a given
17   exertional capacity, the ALJ must first inquire whether the claimant is disabled under the grid rules
18   based on exertional limitations alone, regardless of additional nonexertional limitations. If a grid
19   rule dictates a finding of disability based on the claimant's exertional limitations alone, there is
20   no need to consider non-exertional limitations, and benefits must be awarded. 20 C.F.R. Pt. 404,
21   Subpt. P, App. 2, Rule 200.00(e)(2); Lounsburry, 468 F.3d at 1115-1116; Cooper, 880 F.2d at
22   1155. The ALJ "may not look to other evidence," such as a vocational expert's testimony, to
23   rebut, supplant, or override a finding of disability directed by the grids based solely on a
24   claimant's exertional limitations. Lounsburry, 468 F.3d at 1116.

25   If, however, a claimant's exertional impairments are not "enough, by themselves, to
26   warrant a finding of disabled," the grids may not be used to direct a conclusion of nondisability
27   because the grids do not automatically establish the existence of jobs for persons whose exertional
28   capacity is reduced by severe nonexertional impairments. See Lounsburry, 468 F.3d at 1116. If,

however, the claimant's nonexertional impairments do not "significantly limit the range of work permitted by his exertional limitations," the grid rules may be used as a "framework" for decision-making. See 20 C.F.R. §§ 404.1569a(d), 416.969a(d) 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(e)(2); SSR 96-9p, 1996 WL 374185, at *4.

The ALJ noted that under Rule 201.28 of the grids, plaintiff would not be disabled if he retained the RFC to perform the full range of sedentary work. [AR 21 (citing 20 C.F.R., Pt. 404, Subpt. P, App. 1, Rule 201.28)]. The ALJ concluded that plaintiff's "additional limitations have little or no effect on the occupational base of unskilled sedentary work. A finding of 'not disabled' is therefore appropriate under the framework of this rule." [AR 21].

For the reasons noted above, plaintiff's ability to stand and walk for no more than an hour at a time and his limitations to occasional postural activities are consistent with the definition of sedentary work and therefore would not significantly limit the sedentary occupations plaintiff can perform. Nor would a preclusion against exposure to unprotected heights significantly erode the sedentary occupational base. See SSR 96-9p, 1996 WL 374185, at *9 ("Even a need to avoid all exposure to [environmental] conditions would not, by itself, result in a significant erosion of the [sedentary] occupational base.").

The Commissioner addressed the effect of using a hand-held assistive device in SSR 96-9p, "Titles II and XVI: Determining Capability To Do Other Work–Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work." The need for a hand-held assistive device is a considered an exertional limitation because it affects the claimant's ability to meet one of the "seven strength demands": sitting, standing, walking, lifting, carrying, pushing, and pulling. SSR 96-9p, 1996 WL 374185, at *5. The Commissioner explained that "[s]ince most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand." SSR 96-9p, 1996 WL 374185, at *7 (italics added). The Commissioner noted that "[b]ilateral manual dexterity is needed when sitting but is not generally necessary when

performing the standing and walking requirements of sedentary work," and therefore a claimant who had only one hand free while ambulating could still perform many sedentary occupations. SSR 96-9p, 1996 WL 374185, at *7 & n. 7. An individual who must use a hand-held assistive device because of an impairment affecting one lower extremity "and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers," but "the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded." SSR 96-9p, 1996 WL 374185, at *7. "In these situations, . . . it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work." SSR 96-9p, 1996 WL 374185, at *7.

The first example given by the Commissioner illustrates a situation where the claimant "may still have" (but does not *necessarily* have) the ability to perform sedentary jobs that exist in significant numbers, while the second illustrates a scenario where the sedentary occupational base "may be significantly eroded." SSR 96-9p, 1996 WL 374185, at *7. Plaintiff's limitations fall between the two examples described by the Commissioner. The ALJ found that plaintiff has a normal right lower extremity and a left lower extremity impairment requiring use of a cane. [AR 20-21]. However, plaintiff has an additional impairment-related nonexertional limitation, in that he can only occasionally operate foot controls with the left lower extremity. [AR 18].

The combined effect of plaintiff's exertional and nonexertional limitations on the sedentary occupational base reflected in the grid rules is unclear. The ALJ did not cite any of the Commissioner's policy rulings or any vocational evidence to support his conclusion that plaintiff's limitations did not significantly erode the sedentary occupational base and that plaintiff could perform alternative work that exists in significant numbers in the national economy. See SSR 96-9p, 1996 WL 374185, at *9 ("When the extent of erosion of the unskilled sedentary occupational base is not clear, the adjudicator may consult various authoritative written resources, such as the DOT, the SCO, the Occupational Outlook Handbook, or County Business Patterns. [¶] In more complex cases, the adjudicator may use the resources of a vocational specialist or

vocational expert."). Therefore, the ALJ erred in relying solely on the grids to find plaintiff not disabled.

**Remedy**

The choice whether to reverse and remand for further administrative proceedings, or to reverse and simply award benefits, is within the discretion of the court. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.) (holding that the district court's decision whether to remand for further proceedings or payment of benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531 U.S. 1038 (2000). Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. See Harman, 211 F.3d at 1178.

For the reasons described above, it is clear from the record that plaintiff was disabled from March 10, 2004 at least through March 30, 2008, the date of Dr. Altman's second examination. Plaintiff is entitled to the payment of benefits with respect to that period (to the extent that benefits have not already been paid in connection with the ALJ's prior decision that plaintiff was entitled to a closed period of disability).

However, further development of the record is necessary to determine whether plaintiff's disability ended on March 30, 2008 or continued for a further period of time. As to the question of plaintiff's disability beginning on April 1, 2008, the matter is remanded for further administrative proceedings and a new decision.

**Conclusion**

For the reasons described above, the Commissioner's decision is reversed, and the matter is remanded to the Commissioner for an award of benefits for the period from March 10, 2004 through March 30, 2008. The matter is remanded for further administrative proceedings consistent with this memorandum and order with respect to the period beginning on April 1, 2008.

**IT IS SO ORDERED**

April 11, 2011

_____
ANDREW J. WISTRICH
United States Magistrate Judge